OPINION
This matter concerns a house purchased by appellant, Diocese of Toledo, in the historic district of the Old West End, Toledo, Ohio. Appellant applied for a certificate of appropriateness to have the house demolished. Pursuant to city ordinance, the application was given to the Old West End Historic District Commission ("OWEHDC") for consideration. OWEHDC denied appellant's application. Appellant then sought a review by appellee, during which time appellant made it clear that it wished to use the property as a parking lot. Appellee ultimately affirmed OWEHDC's denial of appellant's application. The matter was appealed to the common pleas court, where the decision to deny the application was again affirmed. The appeal to this court followed.
Appellant raises the following sole assignment of error:
 "The Trial Court erred in affirming the decision of the Toledo City-Lucas County Plan Commission (`Appellee'), denying a Certificate of Appropriateness to permit the Diocese of Toledo to demolish the property located at 526 West Delaware Avenue in the City of Toledo."
 STATEMENT OF FACTS
The following relevant evidence was presented to appellee at its hearing, held May 8, 1997. Appellant purchased a house in January 1996, located at 526 W. Delaware Avenue, Toledo, Ohio, which is on the same city block as Rosary Cathedral, the rectory, and appellant's elementary school. The house was purchased for $17,500. Prior to closing, appellant authorized the removal of interior leaded and stained glass windows and french doors.[1] Also removed from the residence were exterior windows; however, there is no evidence that appellant authorized their removal. On March 12, 1996, appellant received two notices that the property was determined to be a public nuisance. On March 25, 1996, appellant applied for a certificate of appropriateness to have the house on the property demolished.
 a. Ankenbrandt's March 19, 1996 Estimate
On March 19, 1996, William E. Ankenbrandt, rehabilitation specialist, prepared an estimate of what it would cost to renovate the residence. Ankenbrandt listed ninety items that needed repair and estimated that it would cost $38,160 to make the necessary repairs. Among the items listed were repairs for water damaged floors and ceiling and plaster repairs. Ankenbrandt's estimate, however, did not include the cost for kitchen cabinets, although architect Melvin Mull of Angel, Mull 
Associates, Inc. stated in a letter dated December 2, 1996 that there was a "[c]omplete lack of any kitchen (other than a stripped room)."
 b. Degnan's March 20, 1996 Appraisal
On March 20, 1996, Lawrence Degnan appraised the property. With respect to the improvements, Degnan stated that "the estimated cost of repairs [was] 10 to 20% low." Degnan further stated, "Such repairs normally exceed the budgeted estimate, and is felt that the [estimates] in this case are very conservative." Degnan conducted a sales comparison; however, the information Degnan considered for making his comparison was not provided to appellee. Nevertheless, Degnan concluded, "After reviewing the adjusted value range indicated and the subject property being located on a busier street and having no off street parking and no apparent possibility of ever having any, an estimate to the lower middle of the range has been determined, or as: $59,000," once completed repairs were made. Degnan also stated:
 "It is the appraiser's understanding that the purchase price for the subject was $17,500 this coupled with a renovation cost of 110% of the estimate or $37,100 results in a total of $54,600. With [a] `When Completed' value of $59,000, the estimated margin for a proposed developer would be less than ten per cent. This is not adequate to attract a developer and realistically the project must be viewed as not feasible." (Emphasis added.)
With respect to Degnan's analysis, we note that the only estimate of repairs provided to appellee that was in existence at the time Degnan appraised the property was Ankenbrandt's. As indicated above, Ankenbrandt's repair costs were estimated at $38,160, not $37,100. Hence, it is unclear where Degnan received his information concerning the costs of repair.
 c. Complaints Regarding "Mothballing"
Pursuant to the Toledo Municipal Code, appellant's application was referred to OWEHDC for review. OWEHDC opted to delay determination of the application for nine months, pursuant to Toledo Municipal Code § 1153.08(e). During that period, specifically in April 1996, three people; the chairman of OWEHDC, a resident of the Old West End, and president of the Old West End Association, wrote to Robert Burger of the city's Demolition and Nuisance Abatement Department, requesting that the property be securely boarded. Allegedly, the house was not completely boarded and/or heated during the following year.
 d. Report of Economic Review Panel
Pursuant to Toledo Municipal Code 1153.08, OWEHDC formulated an Economic Review Panel ("the panel") and a Task Force to investigate the subject property. On December 3, 1996, the panel issued a report to OWEHDC. In its report, the panel stated, in pertinent part, as follows:
 "It is the consensus of the Members of the Three Person Economic Review Panel that based upon the observations at the site visit to the property at 526 Delaware Avenue, Toledo, Ohio, further reflections, and research that the subject property is not feasible for economic redevelopment, as defined in the relevant ordinance, without economic incentives from governmental or other third party entities.
 "Research papers prepared by St. John and Mull are to be considered a part of this motion the same as if attached hereto." (Emphasis added.)
One of the attached letters to the panel's report, dated December 2, 1996, was from architect Melvin Mull, of Angel, Mull 
Associates, Inc. Mull stated that, although the house had interesting features, it was in "considerable disrepair." Mull noted that the items he observed in one very short visit were: complete lack of any kitchen (other than a stripped room); total rehabilitation required of bathrooms; ceiling and wall damage of uncertain cause; widespread water damage to hardwood flooring; major window replacement requirements; water seepage through the foundation and resultant brick deterioration (in the furnace room, especially); numerous illegal interior changes (apparently to create quasi apartments) including plumbing for extra fixtures in inappropriate places, "cardboard" partitions, lamp cord surface wiring to light fixtures, etc.; lack of gutters and downspouts and resultant exterior ground settlement. Mull also noted as an important factor was the lack of off-street parking for the property, which was "a very major problem, and particularly so on a very busy street such as Delaware Avenue." Mull also stated, "My view of this house is that while it could be a nice house when rehabilitated it does not have `architectural historical merit' in the normally accepted definition of that term, other than to keep an existing house in a neighborhood which has had too many demolitions already." In conclusion, Mull stated, "As indicated in my opening, I'm more reluctant than most to succumb to the demolition mind set, but I do not see any way to reclaim this house without major philanthropy from some source."
The other letter incorporated into the panel's report was from Art St. John, who was an Associate Broker for The Salsberry Company. St. John noted in his December 2, 1996 letter that the present market value of the property was $5,000. If the property were totally rehabilitated, it would realistically bring $49,000 on the open market. St. John noted, however, that the average selling price of the comparable homes in his market analysis was $41,167. St. John also stated that the repair estimates from Ankenbrandt, dated March 1996, were estimated too low for the repair costs St. John currently observed. Namely, the exterior paint estimate was about $2,000 too low; the foundation repair estimate was at least another $2,000 too low; and the kitchen/pantry estimate was many thousands too low if the house is to have a functional and useful kitchen. In St. John's estimation, the full restoration costs would come close to $50,000. In conclusion, St. John stated that about a year prior (before the house had been stripped of windows), he showed the property to a prospect and, at that time, he felt the property had great potential for restoration. However, St. John then stated, "the property has so severely deteriorated over the past year through obvious abuse and neglect, that sadly, it cannot beeconomically restored today." (Emphasis added.)
 e. Report of Task Force
The Task Force also issued a report to OWEHDC, dated December 18, 1996. the Task Force first met on August 29, 1996 and reported on that date that it considered an alternative to demolition as being complete restoration of the property, but"recognized" that complete restoration "would price [the property]beyond any conceivable market for it." The Task Force reported on September 11, 1996 that the property was toured by Kathleen Kovacs of Neighborhoods in Partnership, Inc. ("NIP"). According to the Task Force's report, Kovacs estimated that it would cost $45,000 for "rehab-to-code," plus additional enhance ments. The Task Force also discussed Ankenbrandt estimated "rehab-to-code" costs of $38,500. The Task Force further reported:
 "Ankenbrandt expressed doubt that the current market would permit recovery of costs for rehab of the property. Kovacs suggested that her agency's mission and funding arrangements might permit NIP to rehab and market the property at a loss. Kovacs also spoke knowledgeably about the need for a comprehensive neighborhood solution.
 "Kovacs emphasized that any NIP project must have the approval of the agency's board in order to move forward. For NIP to secure funding to develop a property, the property owner must grant the agency site control. She agreed to explore these matters, pending satisfactory outcome of discussions with appropriate officials of the Diocese of Toledo." (Emphasis added.)
Also according to the report, on November 18, 1996, several Task Force members reported on their progress to OWEHDC. Thereafter, OWEHDC added to the Task Force membership. The enlarged Task Force later agreed to the following alternative to demolition: "Turn the property over to an organization such as Neighborhoods in Partnership to rehabilitate and market." Alternatives which the Task Force rejected were: market the property as-is; patch up the property to squeak by code, then sell as soon as possible; turn over to Habitat for Humanity to be brought up to code and given to a first-time homeowner; complete restoration, followed by intensive marketing to a "historic preservationist" type of owner; make house available for removal from site and rehabilitation on another lot in the Old West End.
 f. Other Submitted Information
On February 15, 1997, Kovacs wrote Bishop Robert Donnally of the Diocese of Toledo and stated that the board of directors of NIP "would like to acquire the property at 526 W. Delaware currently owned by the Diocese of Toledo." NIP, how ever, made no offer of any dollar amount in this letter. On February 25, 1997, the Bishop responded to NIP's proposal, stating that the property is adjacent to Diocesan property on Delaware Avenue and that the Diocese had significant investment on that block. Because of uncertainty about developments in the neighborhood, and specifically on that block, the Bishop stated that the Diocese desired to retain the property at that time.
Although the document was not dated, NIP prepared a "Housing Development Road Map" that stated it would cost NIP $17,500 to acquire the property and $61,134 to rehabilitate it, for a total development cost of $79,210. NIP also estimated the sale price as follows:
"$79,210.00 — 29,210.00 = $50,000
Total Dev't Cost Subsidy All. Est'd Sale Price"
 STATEMENT OF PROCEEDINGS
On March 11, 1997, OWEHDC notified appellant that it denied appellant's request to demolish the house in question. OWEHDC stated that it based its decision on the following findings:
 "1. TMC Section 1153.08(b)(3) states: `The property is not able to be sold . . .' Clearly, there was an offer on the property and rejected by the applicant.
 "2. TMC Section 1153.08(a)(1) states: `The structure for which demolition is sought contains no features of architectural or historic significance, and it does not con tribute to maintaining the character of the historic district.' The structure does maintain the character of the historic district. It is considered a gabled cottage style house in the book American Vernacular Design.
 "3. TMC Section 1153.08(a)(2)(B) states: `There is no feasible and prudent alternative to demolition.' The 526 W. Delaware Task Force said the best alternative was to turn it over to an organization such as Neighborhoods in Partnership. Clearly there is a feasible and prudent alternative to demolition as recommended by the Task Force and agreed with by the Old West End Historic District Commissioners.
 "4. TMC 1153.08(b) `Determination of economic hardship.' We do not find a cause for economic hardship on the part of the applicant.
 "5. TMC Section 1153.08(b)(1) states: `Alternative uses are not feasible because they cannot earn a reasonable economic return . . .' There are alternative uses that can put this property back on the tax roll which is one of the purposes of an historic district per TMC Section 1151.01(b) which states: `Stabilize and improve property values.'
 "6. TMC Section 1153.08(b)(1)(B) states: `A report from a licensed engineer or architect with experience in rehabilitation as to the structural soundness of the structures on the property . . .' The Commissioner of Building Inspection, per a request from the Economic Review Panel, found the house to be structurally sound.
 "7. TMC Section 1153.08(b)(1)(A) states: `Estimated market value of the property in its current condition . . .' The purchase value of the property was $17,500 when acquired by the applicant in January of 1996. The Economic Review Panel in their December 1996 report placed a current value of $5,000. Clearly the structure was impacted by not being mothballed.
 "8. TMC Section 1153.08(b)(4) states: `Economic incentives and/or funding available to the applicant through federal, state, city or private programs.' Neighborhoods in Partnership is willing to utilize such economic incentives.
 "9. TMC Section 1153.08(c) states: `For applications based on a lack of reasonable economic return, the applicant shall have the burden of showing that the property in question is incapable of earning a reasonable economic return in the absence of the proposed demolition.' The applicant had a purchase offer.
 "10. TMC Section 1153.08(f) [sic] states: `During the waiting period the owner of such structure shall maintain or mothball the structure to prevent further deterioration.' There was not a reasonable effort made by the applicant to mothball the structure."
Appellant appealed OWEHDC's decision to appellee. Following a hearing, appellee rendered its decision on May 9, 1997, upholding the decision of OWEHDC, and finding as follows:
 "1. This open-gable cottage style house contributes to maintaining the character of the Old West End Historic District.
 "2. There is a reasonable economic alternative to demolition for the structure by rehabilitating it as a single family structure as proposed by Neighborhoods in Partnership in their purchase offer.
 "3. Neighborhoods in Partnership is actively participating in projects for the Collingwood and Delaware intersection. With these projects will be extensive planning to address the parking needs of commercial and institutional uses in the area. The opportunity exists for the Diocese to constructively address their parking needs by actively participating with Neighborhoods in Partnership in the planning of these projects."
Appellant appealed appellee's decision to the common pleas court, which held that appellee's decision was supported by the preponderance of substantial, reliable, and probative evidence. Specifically, the court found:
 "* * * On February 15, 1997, the Board of Directors of [NIP] proposed to acquire the property, rehabilitate it, and eventually sell it through its affordable housing program. The NIP intended to offer the purchase price of $17,500 to the Diocese. The NIP, as a non-profit community development corporation, has the resources, including access to governmental grants, by which it can rehabilitate such properties as 526 W. Delaware. Moreover the NIP has a track record of successfully rehabilitating similarly deteriorated houses in the Old West End. Therefore, at the time of the Diocese's application, there was a reasonable economic use for the structure, rehabilitation by NIP was economically sound, and the NIP offered a feasible and prudent alternative to demolition."
 LAW AND STANDARD OF REVIEW
R.C. 2506.01 provides that "[e]very final order, adjudication, or decision of any officer, tribunal, authority, board, bureau, commission, department, or other division of any political subdivision of the state may be reviewed by the court of common pleas * * *." R.C. 2506.04 then sets forth the common pleas court's standard of review. The standard is "hybrid" because R.C.2506.04 directs the court of common pleas to resolve both questions of law and questions of fact. Harvey v. CincinnatiCivil Serv. Comm. (1985), 27 Ohio App.3d 304, 306, citing Univ. ofCincinnati v. Conrad (19800, 63 Ohio St.2d 108, 111. Under R.C.2506.04, "the court applies the law to the evidence that was presented to the administrative agency, but acts as a finder of fact in regard to the new evidence; then, reviewing the entire record, the [common pleas] court determines whether the agency's decision was `unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable and probative evidence.' R.C. 2506.04." Id. See, also,Dudukovich v. Housing Authority (1979), 58 Ohio St.2d 202, 207.
Our standard of review on appeal in this case is limited by R.C. 2506.04 which requires that we affirm the common pleas court, unless we find, "as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence." Kisil v. Sandusky
(1984), 12 Ohio St.3d 30, 34. See, also, Neuendorff v. ToledoCity Plan Comm. (Sept. 30, 1998), Lucas App. No. L-98-1089, unreported.
Toledo Municipal Code 1153.08 sets forth the rules concerning an application for a certificate of appropriateness to demolish a structure within a designated historic district. Section 1153.08(a) states, in pertinent part, as follows:
 "* * * the respective historic district commission shall grant the application and issue the certificate when one or both of the following conditions are found to exist.
* * *
 "(1) The structure for which demolition is sought contains no features of architectural or historic significance, and it does not contribute to maintaining the character of the historic district; or
 "(2) There is no reasonable economic use or return for the structure as it exists and either:
 "(A) Deterioration has progressed to the extent that rehabilitation is not economically sound, or
 "(B) There is no feasible and prudent alternative to demolition." (Emphasis added.)
Appellant does not dispute that the house contributes to maintaining the character of the historic district. Rather, appellant relies on subsection (2) as the basis for its application. Because subsections (2)(A) and (2)(B) are separated by "or", appellant only needed to prove one or the other, not both, to have its application granted. Hence, pursuant to 1153.08(a), if the evidence established that there was no reasonable economic use or return for the structure as it exists and deterioration had progressed to the extent that rehabilitation was not economically sound, then OWEHDC was required to grant the application and issue the certificate.
In order to prove hardship that would justify the approval of a demolition application as provided for in Section 1153.08(a)(2), OWEHDC "must find that the building is incapable of earning a reasonable return." (Emphasis added.) Toledo Municipal Code 1153.08(b). Standards and criteria to be considered by OWEHDC, in this regard, include the following items:
 "(1) Alternative uses are not feasible because they cannot earn a reasonable economic return in relation to the following:
 "A. Estimate of the cost of the proposed redevelopment, alteration, demolition, or removal and an estimate of any additional cost that would be incurred to comply with the recommendations of the commission for changes necessary for the continued use of the building and the issuance of a Certificate of Appropriateness;
 "B. A report from a licensed engineer or architect with experience in rehabilitation as to the structural soundness of the structures on the property and their suitability for rehabilitation;
 "C. Estimated market value of the property in its current condition; after completion of the proposed redevelopment, alteration, demolition or removal; and after changes recommended by the commission for the renovation of the existing property for continued use;
 "D. Testimony from a third party architect, developer, appraiser, or other real estate professional experienced in rehabilitation as to the economic feasibility of rehabilitation or reuse of the existing structure on the property.
 "(2) The current economic return on the property in relation to the following:
 "A. The amount paid for the property, the date of purchase, and the party from whom purchased, including a description of the relationship, if any, between the owner of record or applicant and the person from whom the property was purchased;
"* * *
 "C. Real estate taxes for the previous two years and assessed value of the property according to the most recent assessed valuation;
 "D. All appraisals obtained within the previous two years by the owner or applicant in connection with the purchase, financing or ownership of the property.
 "(3) The property is not able to be sold, considered in relation to any listing of the property for sale or rent, price asked, and offers received, if any, within the previous two years, including testimony and relevant documents regarding:
 "A. Any real estate broker or firm engaged to sell or lease the property,
 "B. Reasonableness of the price or rent sought by the applicant,
 "C. Any advertisements placed for the sale or rent of the property.
 "(4) Economic incentives and/or funding available to the applicant through federal, state, city or private programs.
 "(5) Other information considered by the respective historic district commission to be significant in determining whether the property does yield or may yield a reasonable return to the owner."
Additionally, "[f]or applications based on a lack of reasonable economic return, the applicant shall have the burden of showing that the property in question is incapable of earning a reason able economic return in the absence of the proposed demolition." Toledo Municipal Code 1153.08(c). "The showing shall be made in accordance with the standards and criteria set forth in Section 1153.08(b)." Id. According to section 1153.08(k):
 "If, after reviewing all of the evidence, the commission finds that the standards and cri teria set forth in Section 1153.08(b) are satisfied, then the commission shall issue the Certificate of Appropriateness, conditionally or otherwise. If the commission finds that the standards and criteria are not satisfied, the Certificate of Appropriateness shall be denied." (Emphasis added.)
Toledo Municipal Code 1153.08(m) states, with respect to the applicant's responsibilities, the following:
 "During the waiting period the owner of such structure shall maintain or mothball the structure to prevent further deterioration. If the application for a Certificate of Appropriateness is denied, the applicant shall develop a program for continuing maintenance for the structure to ensure that the deterioration of the structure is not caused by the neglect of the structure by its owner or by a tenant."
 ANALYSIS
Appellant relies on Toledo Municipal Code 1153.08(a)(2) (A) as the basis for its application. Because appellant only needed to prove one of the factors listed in section 1153.08(a), if appellant established that there was no reasonable economic return for the structure and rehabilitation was not economically sound, then it was irrelevant, and appellant did not need to prove, whether the structure contained features of architectural or historic significance, contributed to maintaining the character of the historic district, or whether there was a feasible and prudent alternative to demolition. Hence, we are left with reviewing the standards and criteria listed in section 1153.08(b) to determine whether appellant proved that the building was incapable of earning a reasonable return.
Many assertions were made that appellant failed to mothball the structure during the application period, thereby decreasing its value. We recognize that it is good policy to discourage an applicant from deliberately allowing a structure to further deteriorate to ensure a ruling that "rehabilitation is not economically sound." Hence, assuming arguendo that appellant did not do all it could to protect the property against further deterioration, we will consider the property's "as is" and post-renovation values, and the estimates for renovation, as they existed around the time appellant filed its application.
At the time the application for a certificate of appropriateness was made, Ankenbrandt's renovation estimate was $38,160. This estimate, however, was criticized as being too low. Even assuming that Ankenbrandt's estimate was lower than estimates in December 1996 because of the additional deterioration, his estimate still failed to include all the elements necessary for a working kitchen. Hence, based on what is known generally about the property, it is clear that Ankenbrandt's estimate was significantly low. According to St. John, based on the kitchen/pantry estimate alone, Ankenbrandt's estimate was thousands of dollars too low. However, even if Ankenbrandt's estimate was accurate, and assuming that the renovated home could yield a $59,000 selling price, the return on the total investment of $55,600 ($17,500 purchase price, plus $38,160) would only have been $3,400, or a six percent return on the investment, exclusive, of course, of closing costs, property taxes paid during the renovation period, and utilities. Ankenbrandt himself expressed doubt to the Task Force in September 1996 that the current market would permit recovery of costs for rehabilitating the property.
The only other reference to renovation costs came from Degnan who stated that the estimated cost of repairs was ten to twenty percent low. According to Degnan, the renovation costs should instead be $37,100. As noted above, however, there is no explanation concerning the origin of this figure. Hence, there is no way to determine what repairs this amount includes, or whether there was actually another estimate, besides Ankenbrandt's, upon which Degnan relied. Nevertheless, assuming again that this estimate was accurate, Degnan stated, "With [a] `When Completed' value of $59,000, the estimated margin for a proposed developer would be less than ten percent. This is not adequate to attract a developer and realistically the project mustbe viewed as not feasible."
Hence, with respect to the items listed in section 1153.08(b)(1), we find as a matter of law that based on the economic information available at the time of the application, and the testimony from renovation experts and appraisers, such as, Ankenbrandt and Degnan, the amount of gain after renovation could not earn a reasonable economic return. See Toledo Municipal Code 1153.08(b)(1). Additionally, even assuming appellant could recover the full $17,500 for the property, which we note was never actually offered to appellant, the current economic return on the property would not provide appellant any benefit on its investment. See Toledo Municipal Code 1153.08(b) (2).
Toledo Municipal Code 1153.08(b)(3) calls upon OWEHDC to consider whether the property could be sold. We find that, although there was an inquiry, no offer was ever tendered to appellant. Even if an offer had been made, NIP was only willing to offer appellant its initial investment in the property. Moreover, this ordinance does not require appellant to sell at a loss, or even at an arguably break-even amount.
Further, although economic incentives were available to NIP, there was no evidence that economic incentives or funding was available to appellant. Toledo Municipal Code 1153.08(b)(4) states that OWEHDC is required to consider "[e]conomic incentives and/or funding available to the applicant through federal, state, city or private programs." (Emphasis added.) NIP is not the applicant, i.e., the person seeking the certificate of appropriateness, appellant is the applicant. As such, the economic incentives available to NIP are irrelevant to the issue of appellant's application. Moreover, appellant would derive no benefit from any economic incentives as its only option would have been to "grant the agency site control." (Kovacs statement to the Task Force.)
Accordingly, we find that by applying the facts to the standards and criteria to be considered by OWEHDC and appellee, pursuant to section 1153.08(b), all the criteria supports the approval of appellant's application, pursuant to section 1153.08(a)(2)(A). As such, we find that the preponderance of substantial, reliable, and probative evidence establishes that appellant has met its burden.
Additionally, despite OWEHDC's, appellee's, and the common pleas court's findings that NIP offered a feasible and prudent alternative to demolition, we again stress that this factor should not be considered once an applicant has proven one of the bases available to it pursuant to section 1153.08(a). Besides, as stated previously, NIP never tendered an offer to appellant and the "purchase price" that was supposedly going to be offered was merely speculative. Moreover, even NIP would have spent more money on the property than could be recovered. Kovacs stated to the Task Force that NIP might be able to rehabilitate the property and sell it "at a loss." NIP's own "Housing Development Road Map" estimated the total development cost at $79,210, which is in excess of any projected post-renovation value. Even though subsidies might be available to reduce the cost to NIP, the bottom line is that more money would be put into the property than it is worth. Subsidies are still money, no matter how you look at it. Therefore, even if NIP did offer an alternative to demolition, the alternative it offered was not economically sound, in any event.
Furthermore, we find it is important to note that appellee lost sight of appellant's individual right under the ordinance to have its property demolished, if it proved certain things, and, instead, appellee focused on what parking alternatives were available to appellant. Extensive discussion at the hearing was dedicated to the issue of parking for all area businesses and institutions. Appellee's chairman, Richard Meyers, in fact, stated, "I think that the sole issue in my mind that concerns me about this is the fact that there doesn't seem to be anybody who is looking at the big picture." Meyers further stated, "* * * it just seems like this parcel-by-parcel battle, so to speak, is not really serving anybody's interest very well * * *." Meyers later stated:
 "I have no idea what the rest of the Commission feels, but I feel so strongly about the need for a look at the bigger picture that what I'm suggesting is that whether you could accept a delay in the decision and an agreement on the part of the Old West End community and the Diocese to . . . and the City of Toledo . . . to commit to a 60 or 90 day period of concentrated effort to see if we couldn't develop a concept plan anyway. And that part of that might look at some short range changes to . . . by the Division of Transportation . . . to Collingwood Avenue to provide more on-street parking as Mr. Van Landingham suggested, or other issues like that that could begin to immediately address the problems of parking for the Cathedral as well as the other institutions . . . Scott High School. And then, depending on what comes out of that plan, that the future of 526 W. Delaware comes into play depending on what the plan develops. I guess I'm offering that. As I say, I have no idea. We can move forth and the Commission could approve the demolition permit also. I . . . as I say, I have no idea. But I'm wondering if we can't find a way to maybe solve the bigger problem, and this one falls into the, you know, overall picture."
Counsel for appellant responded that he was not authorized to agree to a further delay because appellant was in the same situation a year earlier and that the process had already gone on and on for over a year, without resolution. Thereafter, appellee voted to uphold the decision of OWEHDC.
Regardless of the "overall picture," OWEHDC was required to grant appellant's application if appellant established one of the elements of Toledo Municipal Code 1153.08(a). This burden was met.
Accordingly, we find as a matter of law that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence. SeeKisil, 12 Ohio St.3d at 34. Appellant demonstrated its entitlement to have the application granted at every level of the proceedings. It is irrelevant that the home adds to the historic character of the neighborhood or that NIP wanted to purchase it because appellant proved that renovation was not economically sound. We therefore find appellant's sole assignment of error well-taken.
Insofar as we reverse the decision of the common pleas court, we do not have to reach the merits of appellant's constitutional arguments. Accordingly, appellant's constitutional arguments are rendered moot and found not well-taken.
On consideration whereof, the court finds that substantial justice has not been done the party complaining and the judgment of the Lucas County Court of Common Pleas is reversed. Court costs of this appeal are assessed to appellee.
JUDGMENT REVERSED.
 Melvin L. Resnick, J.
 James R. Sherck, J.
 Richard W. Knepper, J.
CONCUR.
[1] In a letter dated January 19, 1996, counsel for appellant wrote to Isobel O'Brien, counsel for the estate of Chester Ustaszewski, former owner of the property, which stated as follows:
 "As follow up to your conversation with Dawn Jeko, The Toledo Diocese has agreed to permit your client to remove the interior stained glass windows and interior doors from the property at 526 W. Delaware before the closing, provided that (i) the property is left in a safe and secure condition; (ii) no damage is done to the structure of the property; and (iii) no debris is left outside and all outside access is properly blocked and secured. * * *"